# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT NASHVILLE
## Assigned on Briefs September 18, 2013

## STATE OF TENNESSEE v. TRAVIS ANDREW HARRIS

### Appeal from the Criminal Court for Davidson County
### No. 2012-A-804     J. Randall Wyatt, Jr., Judge

### No. M2013-00532-CCA-R3-CD - Filed February 14, 2014

The Defendant, Travis Andrew Harris, was convicted by a Davidson County Criminal Court jury of attempt to commit especially aggravated robbery, a Class B felony, and evading arrest, a Class A misdemeanor. *See* T.C.A. § 39-12-101, 39-13-403, 39-16-603 (2010). He was sentenced as a Range I, standard offender to concurrent sentences of eleven years for the attempted especially aggravated robbery conviction and eleven months, twenty-nine days for the evading arrest conviction. On appeal, the Defendant contends that (1) the evidence is insufficient to support his attempted especially aggravated robbery conviction and (2) the trial court improperly admitted hearsay testimony as substantive evidence. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the court, in which ALAN E. GLENN and JEFFREY S. BIVINS, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Travis Andrew Harris.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Victor S. (Torry) Johnson, III, District Attorney General; and Brian Ewald and Rachel Thomas, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case relates to the attempted robbery and non-fatal shooting of Vincent Vastagh that occurred at his house on December 19, 2011. At the trial, the victim testified that he lived with Dustin Santos Garcia in Nashville on December 19. He said that around 6:00 p.m., he took his dog outside and smoked a cigarette. He said that as he was sending a text message to his brother, his dog began to bark and that he saw an African-American man

walking onto his front porch. He said that he initially thought the person was a neighbor but realized it was a man wearing a black and white bandanna over his face and a "hoodie" over his head. He said the hoodie was black "with white screen print." He said the man pointed a gun at his face and said, "[G]et up and go inside." He said he continued to text his brother, which upset the man. He said the man grabbed his cell phone, threw it into the yard, grabbed the collar of his shirt or hoodie, and told him to go inside. He said he got up from his chair, took a couple steps, and attempted to take the gun from the man. He said that the gun fired, that he felt the bullet enter his leg, that he "tackled" the man, that they fell off the porch into the yard, and that the man stood and fled. He said he attempted to chase the man but was unsuccessful because of the wound to his leg. He said the man ran around the side of his house.

The victim testified that he did not see much of the man's face but that the man's hoodie fell off during the struggle and that he saw the man had a "partial Mohawk style" haircut. He said the man was young and approximately 5'10" to 6' tall. He said he saw the man's face from the nose to the top of his head. He denied knowing the man and said he had never seen him before that night. He described the gun as a small, black nine-millimeter and said he felt the gun touch his head. He denied the man made demands or told him what he wanted. He said he had his wallet and loose change in his pants pockets. When asked why he decided to fight the man, he said that he had lived in Memphis, that his things had been broken and his house broken into previously, and that he was not going to take it. He said he used a wrestling move he recalled from high school to attempt to disarm the man and demonstrated the move for the jury. He said that they were face-to-face when the gun fired and that after he was shot, he took the man "to edge of the porch and knocked him down." He said that he was unable to get his hand on the gun and denied that anything occurred that would have jarred or bumped the gun, causing it to fire.

The victim testified that when he was shot, he felt as though "someone took a hot coat hanger and threaded it through [his] leg" and that it began to hurt "really bad" when he attempted to walk. He noticed the wound was near his femoral artery, called his roommate, who was at work, to come home, and waited for the paramedics and the police. He said that he was unable to walk without assistance, that after he reentered his house, he became light-headed, and that the bleeding increased.

The victim testified that he took his shotgun into the bathroom and waited for the police. He said he saw a hole in his inner thigh but learned later that he had additional wounds. He said that when the paramedics arrived, his pain level was an eight out of ten and that most of his pain was during his recovery. He said that he unsuccessfully attempted to stop the bleeding and that he was concerned he would "bleed out." He did not recall losing consciousness before the paramedics arrived but said he "dozed off" at the hospital.

The victim testified that the man unsuccessfully attempted to rob him. He said he found his phone in the yard before he called his roommate. He said that after the shooting, he saw the man who shot him in court for the preliminary hearing and that the man still had the Mohawk-like hairstyle. When asked at the trial if the shooter was in the courtroom, the victim identified the Defendant. He did not know anyone named Travis Harris.

The victim testified that his roommate called the police and that he spoke to the police before the paramedics took him to the hospital. He was told at the hospital that "the bullet . . . entered and exited twice, leaving four . . . holes." He underwent surgery to repair the wounds and learned he had severe trauma to the scrotum, nerve damage, and muscle loss. He said the bullet entered in his groin area, traveled through his inner thigh, and exited the back of his knee. He said he stayed in the hospital twenty-four hours. He said that the hospital staff treated his pain with morphine and that his pain was much worse after he arrived at the hospital. He said that he was unable to walk without assistance when he was released and that he regained his ability to walk unassisted one and one-half months before his testimony, which was about ten months after the shooting. He said that he still could not walk barefoot because of nerve damage and that the muscles were extremely tight. He said that after he was released from the hospital, he developed blood clots in his leg and was hospitalized for two days. He said he was required to keep his leg elevated to maintain circulation. He said he walked with a slight limp and denied having blood clots or "leg issues" before the shooting.

The victim testified that the physicians treating his wounds said that he should be able to father children but that there was no way to know until he was ready to have children. He said he had scars on his scrotum from the surgery and scars on his leg and inner thigh from the shooting. He said the nerve damage in his foot was permanent. He said that before the shooting, he cooked and worked in landscaping and construction but that he could no longer stand on his feet for hours at a time, lift heavy objects, or move fast. He identified photographs taken at the hospital and within a few days after the shooting, which were received as an exhibit.

The victim testified that he was not involved in a drug deal on the day of the shooting and that he had never sold drugs. He said he possessed a small amount of marijuana for personal use the night of the shooting. He said he obtained the marijuana from someone else. He denied owning and firing a handgun the night of the shooting. He said he only saw the man who walked onto his front porch.

On cross-examination, the victim testified that the Defendant only told him to get up and go inside. He denied that the man demanded money or his cell phone but said that he assumed the man wanted money when he stuck the gun to his head. He said he talked to

-3-

Detective Windsor when he was in the emergency room and felt he was lucid when he gave his statement. He agreed he told the detective that he did not think he could identify the man on the porch but said he knew it was the Defendant because of the Mohawk-like hairstyle. He agreed, though, he did not mention the hairstyle to the detective.

The victim testified that the Defendant was present at the preliminary hearing and that he could not identify the Defendant at the hearing. He agreed he did not mention the shooter's hairstyle during the preliminary hearing but said he was in extreme pain and was in a hurry to get to his doctor's appointment. He denied viewing a photograph lineup. He agreed he first mentioned the hairstyle during his direct examination at the trial.

The victim testified that the shooter wore black or dark pants. He denied it was possible that another person stood on the side of the house or across the street during the shooting. He did not know if the shooter had his finger on the trigger when the gun was held to his head and said he only saw the barrel. He said he assumed the gun was fired intentionally. He said the police took his cell phone and returned it later. He said the police did not mention whether fingerprints were found on the phone.

The victim testified that he did not use marijuana the night of the shooting. He said that although he told the police that he usually drank a six-pack of beer per day, he only drank two beers that day. He agreed that he had not identified the Defendant as the shooter before the trial.

On redirect examination, the victim testified that he had not told anyone about the shooter's hairstyle before the trial because he remembered the shooter's hairstyle on his way to the courthouse for the trial. He agreed the preliminary hearing occurred on December 27, 2011, and that he was hospitalized for blood clots the following day.

The victim was provided a photograph of a person with a Mohawk-like or "faux-hawk" hairstyle with no indication of when the photograph was taken. The victim identified the Defendant as the person in the photograph and said the Defendant clothes in the photograph were different from the clothes the Defendant wore at the time of the shooting. He said the Defendant shot him.

Dustin Santos Garcia testified that he lived with the victim on the night of the shooting and was working two or three miles from their house when the shooting occurred. The victim called him and said he had been shot. He left work, arrived home five minutes later, unlocked the door, walked inside, locked the door behind him, saw blood inside the house, and found the victim in the bathroom. He said the victim was alert and able to

communicate, although the victim was in "extreme pain." He said he looked at the porch after the police arrived and recalled an overturned chair.

Mr. Garcia testified that he called 9-1-1. The recorded 9-1-1 call was played for the jury. In the recording, Mr. Garcia provided the address and location of the victim's house. He said that blood was everywhere on the carpet and that his roommate told him someone tried to rob him and shot him in the leg and groin. The victim was conscious and breathing. He said the shooting occurred about fifteen minutes before the 9-1-1 call. He told the operator that his roommate tackled the shooter, who ran and jumped over a fence. He said that from the amount of blood on the carpet, it looked like the wound was serious but that the blood flow had slowed. He said they could not find an exit wound and thought it was possibly a "graze."

Mr. Garcia was asked for a description of the shooter, who asked the victim to describe the shooter. Mr. Garcia put the operator on speaker phone and said the shooter was a "black male with a black hoodie with white print, blue jeans, and a black doo rag with white print over his face." He said the gun was black. He said the shooter came in the front door, tackled the victim, shot the victim, and left. He said that the victim attempted to follow the shooter but was unsuccessful due to his injuries. He said the shooter ran to the right of the house and jumped over a fence. In the recording, the victim provided information to Mr. Garcia, who relayed the information to the operator. The operator stayed on the line until the paramedics arrived. Mr. Garcia told the paramedics that the victim was in the bathroom.

Mr. Garcia testified that he did not sell drugs out of the house and that to his knowledge, no drugs were sold from the house the night of the robbery. He said he permitted the police to enter his and the victim's house and cooperated fully with the police. On cross-examination, Mr. Garcia stated that he did not speak to the police about the shooting after they left the house. He denied seeing the Defendant at the house.

Metro Police Crime Scene Investigator Felicia Evans testified that she processed the scene. She found a ten-millimeter cartridge casing lying on the front porch, a projectile strike in the vinyl siding of the house three feet from the ground, cigarette butts, and an empty beer can. She obtained fingerprints from the beer can found outside the house, and Investigator Lynn Mace obtained fingerprints from the front and storm doors. She said, though, that none of the fingerprints were matched to a person. She identified photographs she took of the scene, including the front of the house, the projectile strike in the vinyl siding, the cartridge casing, the beer can, the cigarette butts, and the blood trail inside the home from the front door, into the kitchen, and into the bathroom. The photographs were received as an exhibit.

On cross-examination, Investigator Evans testified that although she collected fingerprints at the scene, she did not analyze those fingerprints. She said the victim's cell phone was collected from the bathroom but was not fingerprinted. She said she was unable to perform a trajectory analysis of the strike mark because the analysis required two fixed points of reference, but only one was present. She collected the victim's clothing from the bathroom.

Metro Police Officer Jason Wong testified that he was the first officer to respond to the 9-1-1 call on December 19, 2011, and that Mr. Garcia opened the front door, told him the victim was shot, and led him and the paramedics to the bathroom. He was unable to talk to the victim when the paramedics were treating him and said he talked to Mr. Garcia, who provided little information because he was not present during the shooting. He said that the victim was holding a shotgun when he entered the bathroom, which he recovered, and that he did not recall if it was loaded. He said he saw a trail of blood leading to the bathroom.

Officer Wong testified that Mr. Garcia provided a description of the shooter and the direction in which the shooter fled, that additional officers looked for someone matching the description, and that nobody was found initially. He said that Mr. Garcia did not limit his access to the house. He said a handgun was not recovered. He left the scene about two hours after he arrived.

Officer Wong testified that about twenty minutes after he left the scene, he received a call to return to pick up some equipment left behind by another officer. He said that before he reached the house, he turned off the police car's headlights and observed the area. He said that as he approached the house, he saw a "figure of a person" standing next to the victim's house. He identified the person as the Defendant and said the Defendant was "bent at the waist . . . looking for something on the ground." He said that the Defendant looked through the trash and that he called for backup. He said that the Defendant saw him and fled. He said the Defendant wore a red hoodie and dark shorts that might have been basketball or gym shorts. He said he could see the Defendant clearly.

Officer Wong testified that he chased the Defendant to the back of the house and over a chain-link fence but lost him after jumping over a second fence. He said that he identified himself as a police officer but that the Defendant did not stop. He talked to the additional responding officers while chasing the Defendant and gave the officers his location and the Defendant's description. He said the Defendant was apprehended by another officer on a nearby street. He said about fifteen to twenty minutes elapsed from the time he saw the Defendant and his apprehension.

On cross-examination, Officer Wong testified that the Defendant's clothes did not match the description provided by the victim's roommate. He agreed that when he saw the Defendant initially, the Defendant was not doing anything that would prompt an arrest. He agreed that the Defendant did not throw anything away as he fled, that no weapons or ammunition were found when the Defendant was searched, and that the Defendant possessed nothing that linked him to the shooting.

Metro Police Sergeant Joseph Winter testified that he was dispatched to the scene on December 19, 2011, and that additional officers were already there. He said he spoke to Mr. Garcia, who was cooperative and allowed the police into the house. Mr. Garcia told him that things were out of place on the porch and that he unlocked the door, entered the house, saw the blood, found the victim in the bathroom, and called 9-1-1. Sergeant Winter did not speak to the victim.

Metro Police Sergeant Lukas Merithew testified that he arrived at the scene about five minutes after the 9-1-1 call. He said he assisted in securing the scene but did not enter the house. He said he stood with Mr. Garcia until the detectives could interview him. He saw a cartridge casing on the front porch and a bullet hole in the vinyl siding of the house and showed the evidence to the crime scene investigators.

Metro Police Detective Michael Windsor testified that he was the lead investigator in this case and that the victim had been transported to the hospital before he arrived at the scene. He said he went to the hospital to speak with the victim, who had injuries to his leg. He said the victim was being treated by hospital personnel when he attempted to speak with him. He said the victim explained what happened, was calm, and provided a description of the man who shot him, which was identical to the description provided earlier.

Detective Windsor testified that he spoke with Officer Wong later that night and learned that someone was near the scene. He returned to the scene. He said that the Defendant was apprehended about two hours after the 9-1-1 call and that he interviewed the Defendant at the police station. The Defendant's recorded statement was played for the jury.

During the interview, the Defendant stated that he was near the victim's house at the time of his arrest because he was walking through the area and that his father lived nearby. He said he had been to his friend Carrie's house. He said he stayed at various houses in the area and did not live at a particular place.

The Defendant stated that various people gave him rides or that he walked. He denied going through or hovering over the trash and said he was walking through the property. He denied knowing an incident occurred at a house near the trash where he was spotted by

Officer Wong. Detective Windsor told the Defendant that a shooting occurred at the house and that the Defendant matched the description of the shooter. The Defendant denied being involved in a shooting. The detective stated that the shooting might have been accidental, that the victim claimed the shooter was trying to rob him, and that the victim had a history of selling drugs and weapons charges. The detective told the Defendant that tests existed to determine if the Defendant was at the scene of the shooting, and the Defendant denied shooting anyone. When asked if he had fired a gun recently, the Defendant initially denied firing a gun but admitted later that he and his "homeboy" had fired guns earlier that day and rubbed his hands on his pants. The detective told the Defendant that the Defendant knew what happened and returned to recover something left behind. The Defendant denied he was at the scene to recover something and said he did not stand at the side of the victim's house while someone else committed the robbery.

The detective told the Defendant that the shooter was not wearing a red hooded sweatshirt but that many times suspects changed clothes in order not to "stick out like a sore thumb." The Defendant denied changing clothes. The Defendant wore a red hooded sweatshirt and dark pants or shorts and had a Mohawk-like hairstyle.

The detective told the Defendant he believed that the victim was selling drugs, that either a robbery or a drug sale went wrong, that an accidental shooting occurred, that the Defendant was involved, and that he needed the Defendant to tell him what occurred. The Defendant said, "[H]e put me up on a lick. I left something[.]" The Defendant said that the unidentified male, his friend and homeboy, talked about trying to take something from someone and that his friend told him the victim had marijuana and "weed brownies." He said that his friend encouraged him to take marijuana from the victim but that it was not a robbery. He said that he ran onto the victim's porch, that he hoped the victim had something on him, that the victim did not have anything, that the victim reached, and that the Defendant grabbed. He denied knowing the victim but said his friend knew him. He said the victim was on the porch when he approached the victim's house. He said he "ran up" on the victim and checked his pockets. He denied having or seeing a gun but said he heard a gunshot. When asked why he returned to the victim's house, he said he was not returning but was walking around the area. He declined to identify his friend and said that his unwillingness to provide a name had nothing to do with snitching. He said identifying his friend would not make a difference.

The Defendant told the detective that he and the victim "wrestled" on the porch but that he did not see a gun. He said that the victim was sitting on a chair when he approached the porch, that he searched the victim while the victim was sitting, and that he did not find a gun. He denied taking the victim's cell phone. When asked if he feared federal charges

if he mentioned having a gun, the Defendant said, "Maybe." The Defendant later denied having a gun that night.

The Defendant stated that his friend told him the victim was supposed to have obtained marijuana and returned home with the drugs. He said that most people kept drugs in their house and that "once you catch a person outside, you bring a person inside the house." When asked how he was going to force someone inside the person's home without a gun, he said, "[Y]ou'd be surprised how scared somebody will be."

Detective Windsor testified that he gave the Defendant false information during the interview. He said that he falsely told the Defendant that the victim had previous drug- and weapons-related convictions. He also falsely told the Defendant that the victim was uncooperative. He said the result of the gunshot residue test was inconclusive, which occurred often. He identified a photograph of the Defendant taken the night of the shooting.

Detective Windsor testified that after he learned from the victim that the shooter took the victim's cell phone and threw it into the yard, he requested the officers at the scene to look for it. He said, though, that the phone was not analyzed for fingerprints.

On cross-examination, Detective Windsor testified that although the victim stated that the Defendant did not go through his pants pockets, the Defendant admitted searching them. He agreed that the victim never mentioned another person being with the Defendant and that the Defendant refused to identify this person. He agreed the Defendant stated that his plan was to take marijuana and marijuana-baked brownies from the victim. He said the Defendant agreed with the "parts of the story" the detective knew were false. Detective Windsor agreed that "to do a lick" was slang for theft or robbery and that the Defendant said initially the plan was to "grab something and run," not commit a robbery.

Detective Windsor testified that the Defendant's clothes at the time of his arrest did not match the description provided earlier that night. He agreed the Defendant said he was in the victim's neighborhood because he liked to walk and stayed overnight at various places but said the places the Defendant described were not nearby. He said the closest place the Defendant described was about a two-hour walk. He agreed the Defendant did not have anything in his possession at the time of his arrest.

Detective Windsor testified that although the recorded statement showed that blood swabs were taken from the Defendant, those swabs were not analyzed. He said it was a technique used to obtain more information from a suspect. He agreed the victim initially stated that he could not identify the shooter, which was the reason the victim was never shown a photograph lineup.

On redirect examination, Detective Windsor testified that enough time elapsed between the shooting and the Defendant's apprehension for the shooter to have changed clothes. He said it was possible that the shooter could have worn clothes under the clothes that were visible during the shooting. He agreed that the Defendant said his father's house was his primary residence, that the house was about two miles from the victim's house, and that the city buses drove in the area. He stated that the Defendant claimed he was able to "get rides" from various people.

The Defendant testified that on December 19, 2011, he was with Emaunel, also known as Man-Man, who was a close childhood friend. He said that Emanuel wanted to obtain "some weed" and that he "tagged along." He said he did not know where they were going to get the drugs but ended up at the victim's house. He said that Emanuel told him to wait on the side of the victim's house out of sight and that he did not think it was a strange request because some drug dealers did not like meeting new people. He said that although Emanuel never said he was going to pay for the drugs, he learned Emanuel was not going to pay for them when he saw the victim and Emanuel struggling on the porch. He said he did not know Emanuel had a gun with him and had never seen the victim before that night.

The Defendant testified that Emanuel wore a black and white bandana around his neck that night but that he did not think much about it. He said he ran when he heard the gunshot and did not see what happened to Emanuel or the victim. He said he wore the same clothes to the victim's house that he wore during his police interview. He said that he lied when he told the police a friend "put him up to this," that he could not "snitch" on his friend, and that he confessed. He said that the shooting weighed on his conscience and that he had sympathy for the victim. He said, "Either you snitch and die or you take the charge and live." He decided to protect his friend.

The Defendant testified that he wrote a letter to the victim after the robbery and that he apologized to the victim for the "hurt and harm." He denied hurting the victim but said he "had remorse for it" and apologized. He said that he did not know a robbery was going to occur, that Emanuel did not ask him to participate or act as a lookout during the robbery, and that he did not expect anything in return for having gone with Emanuel. He said they walked from Emanuel's family member's house about three streets from the victim's house. He said he ran to a female friend's house after the robbery and denied changing his clothes there. He said his statement to the police lacked detail because he did not know any details.

On cross-examination, the Defendant testified that he did not know Emanuel's last name, although they went to school together and had known each other for about eight years. He denied knowing Emanuel's mother, father, aunt, uncle, grandmother, and grandfather but said he knew Emanuel's siblings. He said Emanuel grew up in foster care but denied

knowing the foster parents. He recalled Emanuel's sister's name was Brittany but could not recall her last name. He could not recall Emanuel's brother's name.

The Defendant testified that he initially told the police that he knew nothing about the robbery and was not there when it occurred. He agreed his initial statement was false. He said he admitted being at the victim's house when the detective mentioned the gunshot residue test because he had fired a gun earlier that day. He recalled the detective telling him that the gunshot residue test could determine when the Defendant last fired a gun but denied that prompted him to confess. He said "conscious guilt" caused him to confess. He said he felt guilty because he was there.

The Defendant testified that the detective did not suggest another person who might have been responsible for the robbery and that he did not supply the detective with another name. When asked why he thought he needed to take the blame for someone who was not implicated, he said, "[T]o keep me from snitching I would rather take the blame for it myself." He agreed, though, that he was the only person implicated in the robbery.

The Defendant testified that before the robbery, he was at Emanuel's aunt's house and that he shot guns around 1:00 p.m., but when reminded he stated during his police interview that he shot guns in the evening, he agreed. He said he shot guns with his friend John Cheers and agreed Mr. Cheers was not present at the trial. He said that he and Emanuel played video games and smoked marijuana at Emanuel's aunt's house and that when they smoked all the marijuana, Emanuel decided to get more. He denied asking from whom and where they were going to get more marijuana.

The Defendant testified that it was dark when he and Emanuel arrived at the victim's house. He said he and Emanuel did not speak to each other when they walked from Emanuel's aunt's house to the victim's house. He said that he did not ask Emanuel why he wanted him to wait at the side of the victim's house and that he looked around the side of the house because he was curious. He first said the victim was sitting on the porch when he looked around the corner of the house but then said the victim was standing. He said he turned his head and heard the gunshot. He first denied seeing the victim and Emanuel struggle but then admitted seeing them struggle before hearing the gunshot. He said he ran to Tosha's house but denied telling her what occurred. He denied speaking with Emanuel after he fled.

The Defendant denied returning to the scene. He said Officer Wong's testimony that the Defendant was going through the trash and fled the scene was untrue. He said he ran from Officer Wong, explaining,

Officer Wong was coming down the street . . . , I'm walking up the street, so we pretty much going the same way. I seen Officer Wong turn his spotlight towards my way, but I'm walking, so I act like I was walking towards the same house . . . but as I walked, I walked past the trash can towards the fence and took off running. Mr. Wong had never got outside his car to come to chase me, because how do I know, because I really I had ran next door and sat there and watched Officer Wong stay in his car the whole time.

He agreed it was a coincidence that he was walking on the same street as the victim's house at the time Officer Wong was there and said he had someone else to visit nearby.

The Defendant testified that Emanuel was known to carry a gun from time-to-time and that it would not surprise him if Emanuel was carrying a gun the night of the robbery. He agreed that he wrote a letter to the victim apologizing for the incident and that he never mentioned he was not the person who caused the victim's injuries. He agreed he wrote, "I'm writing to apologize for the hurt and pain that [has] been caused towards you, your family and friends. I don't mean any harm towards you at all. Nobody was supposed to get injured." He said he and Emanuel were only going to take the marijuana.

On redirect examination, the Defendant testified that portions of his statement to the police were true. He agreed he told the detective that another person was involved in the robbery. He said he and Emanuel smoked three or four "blunts . . . back to back." He said he was intoxicated when they arrived at the victim's house.

On recross-examination, the Defendant testified that he knew he was admitting to committing a robbery during the police interview and that he said he would accept the consequences. He agreed that he mentioned that a friend "put [him] up on a lick" in his police interview and that his trial testimony was the first time he claimed no involvement in the shooting.

Upon this evidence, the jury convicted the Defendant of attempted especially aggravated robbery and evading arrest, and the trial court sentenced him to concurrent sentences of eleven years for the robbery conviction and eleven months, twenty-nine days for the evading arrest conviction. This appeal followed.

**I**

The Defendant contends that the evidence is insufficient to sustain his attempt to commit especially aggravated robbery conviction. He argues that the State failed to prove with sufficient corroboration that he intended to rob the victim. The State responds that the

-12-

evidence is sufficient and that the Defendant's statement to the police was corroborated sufficiently. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. *See State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. *See State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005) (quoting *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998)). Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999); *State v. Buttrey*, 756 S.W.2d 718, 721 (Tenn. Crim. App. 1988). The standard of proof is the same, whether the evidence is direct or circumstantial. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011). Likewise, appellate review of the convicting evidence "'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Id.* (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

*Corpus delicti* means "the body of the crime." *State v. Shepherd*, 862 S.W.2d 557, 564 (Tenn. Crim. App. 1992). The two elements necessary to prove the *corpus delicti* are "(1) that a certain result has been produced, for example, a man has died or a building has been burned, and (2) some person is criminally responsible for the act." *Wooten v. State*, 314 S.W.2d 1, 5 (Tenn. 1958). Our supreme court has held that:

> [W]hile the *corpus delicti* cannot be established by confessions alone, yet the confessions may be taken in connection with other evidence, direct or circumstantial, corroborating them, and, if from all of the evidence so considered together the corpus delicti and the guilt of the person with reference thereto is established beyond a reasonable doubt, it is the duty of the jury to convict.

*Ashby v. State*, 139 S.W. 872, 875 (Tenn. 1911). Only slight proof is required to establish the *corpus delicti. State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000).

The Defendant was charged with attempt to commit especially aggravated robbery. The State was required to prove that the Defendant attempted to commit a robbery using a deadly weapon and that the victim suffered serious bodily injury. *Id.* § 39-13-403 (2010). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." *Id.* § 39-13-401 (2010). A deadly weapon includes a firearm. *Id.* § 39-11-106(a)(5)(A) (2010). Serious bodily injury includes bodily injury involving protracted or obvious disfigurement. *Id.* § 39-11-106(a)(34)(D).

In his statement to the police, the Defendant stated that his friend put him "up on a lick" and that he returned to the scene because he "left something." He was told the victim had drugs inside his house, and a friend put him up to taking marijuana from the victim. The Defendant said that he ran onto the victim's porch, that he searched the victim, who had no drugs or money, and that he told the victim to go inside. The Defendant said that they struggled and that he heard one gunshot, although he denied having a gun. The Defendant stated that most people kept drugs in their house and that "once you catch a person outside, you bring a person inside the house."

At the trial, the victim testified that the Defendant pointed a gun at his face and told him to "get up and go inside" his house. The victim resisted and interfered with the Defendant's plans to enter the victim's house. Although the victim denied selling drugs from his house, he admitted possessing marijuana for personal use the night of the shooting. The Defendant admitted in his police statement that he had knowledge that the victim obtained drugs and returned home with the drugs and that he intended to take the drugs from the victim. The Defendant believed that most people kept drugs inside their houses and that "once you catch a person outside, you bring a person inside the house." The evidence showed the Defendant returned to the scene two hours after the 9-1-1 call, looked through the trash near the victim's home, and fled from the police after being seen. During the police interview, the Defendant admitted leaving something behind, although he never stated what it was. Moreover, the Defendant wrote the victim a letter stating that he apologized for the "hurt and harm" to the victim, that he did not "mean any harm," and that "[n]obody was supposed to get injured." Likewise, the Defendant did not deny shooting the victim. We conclude that the Defendant's statement was sufficiently corroborated.

Regarding the use of a deadly weapon, the victim testified that the Defendant possessed a handgun when he demanded the victim enter his house. Our statutes define a firearm as a deadly weapon. *See* T.C.A. § 39-11-106(a)(5)(A). Regarding serious bodily injury, the victim testified at length regarding his injuries and pain. The victim suffered severe trauma to his scrotum, underwent surgery to repair the injuries, had muscle loss and nerve damage, and walked with a slight limp. Photographs of the scars to his scrotum and

-14-

thigh were received as exhibits. We conclude that the victim suffered serious bodily injury and that the evidence is sufficient to support his conviction.

We note that the notice of appeal covers each of the Defendant's convictions, although he has not raised an issue regarding the evading arrest conviction. In any event, we conclude that the evidence is sufficient to support the evading arrest conviction. The Defendant is not entitled to relief on this basis.

## II

The Defendant contends that the trial court erred by admitting the recording of the 9-1-1 call. He argues that the recording contained hearsay and that the State did not offer a qualifying exception to the rule against hearsay. The State responds that the issue is waived for failure to object properly at the trial and failure to raise the issue in the motion for a new trial. Alternatively, the State argues that the recording was a command for help and was not offered for the truth of the matter asserted or that the recording was an exited utterance. We conclude that the issue is waived and that the Defendant is not entitled to relief.

At the trial, the recording of Mr. Garcia's 9-1-1 call was played for the jury without objection. The Defendant waited to object until after the recording was played and the State requested it be received as an exhibit. Counsel stated, "Judge, I would object to that being entered as substantive evidence." The trial court found that the recording could be admitted as part of Mr. Garcia's testimony. We note the Defendant did not state the basis for his objection. Likewise, in his motion for a new trial, the Defendant stated that the "trial court erred in allowing hearsay testimony without exception from the witnesses for the State." Again, the Defendant did not state in the motion the basis for his contention or identify the alleged hearsay. The transcript of the hearing on the motion for a new trial also fails to identify the specific testimony involved or the basis for his contention. The trial court's order denying the motion for a new trial only states that "[t]he Court finds no instance of improperly admitted hearsay testimony at the trial. Therefore, the Court finds that this issue is without merit."

Regarding a ruling related to the admission of evidence, the rules of evidence state that "a timely objection . . . stating the specific ground of objection if the specific ground was not apparent from the context" is required. Tenn. R. Evid. 103(a)(1). Although the Defendant objected to admitting the recording as substantive evidence, he failed to object before the recording was played for the jury and failed to state the specific ground for his objection. Tennessee Rule of Appellate Procedure 36(a) states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful

effect of an error." T.R.A.P. 36(a). Likewise, the Defendant failed to identify the testimony at issue in his motion for a new trial and failed to state the specific ground for relief. Tennessee Rule of Appellate Procedure 3(e) states "that in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission . . . of evidence . . . unless the same was specifically stated in a motion for new trial; otherwise such issue[] will be treated as waived." T.R.A.P. 3(e). Although the Defendant raised the issue of erroneously admitted evidence, he failed to identify the testimony and to state the reason the evidence was admitted erroneously. We conclude that the issue is waived.

Based on the foregoing and the record as a whole, we affirm the judgments of the trial court.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE